UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JUAN ANTONIO PENA RENDON**,                    Civil Case No. 3:11-CV-01401-KI

                 Plaintiff,                    OPINION AND ORDER

      v.

**COUNTY OF MULTNOMAH**, a Political
Subdivision of the State of Oregon; **DANIEL
STATON**, Multnomah County Sheriff;
**KEVIN JONES, ADAM SWAIL, JAN
KUBIC**, in their Individual and Official
Capacity,

                Defendants.


      Robert L. Sepp
      8 North State St., Suite 300
      Lake Oswego, OR 97034

            Attorney for Plaintiff


Page 1 - OPINION AND ORDER

Jenny Morf, County Attorney
for Multnomah County
B. Andrew Jones
Assistant County Attorney
Office of Multnomah County Attorney
501 S.E. Hawthorne Blvd., Suite 500
Portland, OR 97214

      Attorneys for Defendants

KING, Judge:

Plaintiff Juan Antonio Pena Rendon[1] brings a claim for unlawful arrest under § 1983 against Multnomah County deputies Kevin Jones, Adam Swail, and Jan Kubic. Against Multnomah County, he alleges claims for false arrest, assault/battery, defamation, and intentional infliction of emotional distress. He now concedes his claims for negligence and intentional interference with contract.

Pending before me is the defendants' Motion for Summary Judgment [21]. For the following reasons, I grant the motion and dismiss the First Amended Complaint with prejudice.

## UNDISPUTED FACTS

For two months before deputies arrested Pena, on June 8, 2011, they had been investigating him for selling heroin in Portland. Deputy Jones began working with a confidential informant and arranged three controlled drug buys during those months in which the informant purchased heroin from "Doe" and "Doe 2." Deputy Jones subsequently learned from the Does that their heroin supplier was Pena.

---

[1]The case caption is "Rendon v. County of Multnomah," but I follow plaintiff's counsel's lead and refer to plaintiff as "Pena" throughout this Opinion.

Specifically, after the first controlled buy, but before the second, the informant told Deputy Jones that Doe's source of heroin was an Hispanic male. The informant then told Deputy Jones that Doe would be leaving the second controlled buy to meet with Doe's source to purchase an ounce of heroin. Deputies followed the Does from the second buy to a trailer park, where the Does stopped for a short time, and then followed the Does to a car dealership at 1205 SE 82nd Avenue in Portland. They watched Doe and Doe 2 meet with an Hispanic man (later learned to be Pena) at the dealership; deputies snapped a photograph of Pena in the office of the car dealership. Pena says he knew Doe because Doe provided detail work on cars at the dealership and Doe 2 was Doe's significant other.

Deputy Jones then conducted a third controlled buy, using the same informant. When the substance Doe sold to the informant tested positive for the presence of heroin, Deputy Jones obtained a search warrant for the Does' persons, vehicle and residence. Deputies found several grams of heroin in Doe's possession when they executed the warrant on June 7, 2011. After executing the search warrant at the residence, and finding more heroin, a digital scale and packaging material, deputies gave Doe his Miranda warnings and asked for the name of Doe's heroin source. Doe told them "Tony" who worked at a car dealership at 1205 SE 82nd Avenue. Doe 2, independent of Doe, named "Tony" at the car dealership as the heroin source.

Doe gave deputies Tony's phone number and address. Deputy Joshua Zwick drove to the car dealership and parked across the street in a location with a good vantage point of Pena. Deputy Jones then directed Doe to call Tony. Deputy Zwick saw Pena answer a call on his cell phone. Deputy Jones, listening to both sides of the call, heard Doe say that Doe had been robbed. Tony asked for details, which Doe gave; Doe then said he could not pay Tony for the drugs Tony

Page 3 - OPINION AND ORDER

had given him.  Deputy Zwick watched Pena end his call at the same time Deputy Jones watched

Doe end the call.

Deputies followed Pena home from the dealership that night.  Pena saw a black F-150

following him from the car dealership to his home.  He did not attempt to avoid the tail.[2]  Pena

told his significant other, Teresa Beltran-Carbajal, to call the police if she saw the truck.  The

truck turned out to be a Multnomah County sheriff's vehicle.

On June 8, 2011, Doe called Deputy Jones telling him Pena had called and had heroin he

wanted Doe to pick up.  Although deputies had placed Pena under surveillance, they did not see

Pena distribute heroin that day.  Deputy Jones did not confirm that Pena's number appeared in

Doe's call log for the day.

In a marked police car, Deputy Michael Lee waited for Pena on his way home that night

and, after confirming with Deputy Jones that he had the correct vehicle, Deputy Lee initiated a

traffic stop.  Deputy Jones joined Deputy Lee within minutes, telling Pena he believed Pena was

involved in distributing heroin.  According to Deputy Jones, he gave Pena his Miranda rights and

Pena said he understood them.  Pena disputes that he was given his rights; when he asked for

them, Deputy Jones told Pena he had no rights because he was a Mexican.  The officers

questioned Pena for about an hour.  Pena repeatedly denied permission to search his car.

According to Pena, the "deputies threatened me with deportation, that I would go to jail or

prison, that they would just get a search warrant, or that my kids would be taken away."  Pena

Decl. ¶ 14.  One deputy accused Pena of being in the United States illegally and of having a fake

---

[2]Deputies noted Pena driving below the speed limit, making erratic turns, and driving into parking lots and different buildings.  They believed he was trying to detect a tail.  I view the evidence in the light most favorable to Pena, however.

driver's license.  Deputies repeatedly accused Pena of being a drug dealer.  Pena finally gave Deputy Jones permission to search the car, signing a consent form, but Deputy Adam Swail and the drug detection dog found no drugs.

While the search of the car proceeded, Pena stood by the side of road, smoking cigarettes, out of handcuffs.  Pena also consented to a search of his cell phone.

After the search, Deputy Jones told Pena he was under arrest for conspiracy to distribute heroin.  Deputy Jones also asked Pena for permission to search his apartment and the car dealership, and Pena consented even though he said he had no authority to consent to a search of the dealership.

From the time Deputy Jones first handcuffed Pena until Pena was transported to the dealership, deputies had taken the handcuffs on and off as many as eight times.  Although he testifies in his declaration that his wrists hurt the following day from the handcuffs, he testified in his deposition that he did not have any injuries to his wrists or hands because of the handcuffs. Compare Pena Decl. ¶ 19 with Pena Dep. 133:24-134:1.

Deputy Lee transported Pena to the dealership, and Deputy Swail and Sergeant Tim Wonacott met them there.  Pena was allowed out of the patrol car, out of handcuffs, to smoke cigarettes; he made small talk with the deputies while Deputy Swail searched the dealership. While outside the dealership, Deputy Wannacott showed Pena his sidearm and commented that Pena should not do anything stupid.  Pena asserts he was in "fear for my physical safety."  Pena Decl. ¶ 23.  Pena contends he was not given his Miranda rights until sixty minutes after arriving at the dealership.

Page 5 - OPINION AND ORDER

Deputy Lee then transported Pena to the Multnomah County Detention Center and booked him into custody.

Meanwhile, Deputy Jones and Sergeant Kubic arrived at Pena's apartment, meeting a Spanish-speaking police officer there. After being told in Spanish that Pena had been arrested for making a drug delivery, Beltran-Carbajal consented to a search of the apartment. The officers found a jewelry box, with a strong scent of heroin, and a digital scale, with what looked like heroin residue on it, along with packaging. A field test of the scale showed a positive reaction for heroin. Pena contends the scale was used by he and Beltran-Carbajal for weighing other people's jewelry or gold. Testing of the scale at the Oregon state crime lab confirmed the presence of heroin.

Pena contends he now suffers from headaches, loss of appetite, and has no desire to be intimate with his significant other. He also claims to be fearful of law enforcement and that his reputation has been harmed. He declares , "I have never possessed, dealt, sold or manufactured heroin. Nor have I ever conspired to distribute, sell, or manufacture heroin." Pena Decl. ¶ 4.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the

non-moving party and draw all reasonable inferences in favor of that party." Nicholson v.

Hyannis Air Service, Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (citation omitted).

## DISCUSSION

I.   Defendant Sheriff Daniel Staton

As an initial matter, although Pena includes Sheriff Daniel Staton in the caption of his

First Amended Complaint, Pena did not make a specific claim against him.  Pena generally

alleged only that Sheriff Staton was responsible for policy implementation at the Sheriff's Office

and that Sheriff Staton ratified the actions of his deputies.  Pena offers no facts or argument in

support of his theories.  Sheriff Staton is dismissed with prejudice.

II.   Section 1983 Claim

In his Section 1983 claim, Pena alleged violations of his Fourth Amendment rights, as

well as due process and equal protection rights.  I grant defendants' motion for summary

judgment as to the latter two claims as Pena has not argued in opposition to defendants' motion

for summary judgment.  I only address Pena's Fourth Amendment claim against the deputies.

Pena alleges deputies Jones, Swail, Lee, and Kubric arrested him without probable cause.

A warrantless arrest is reasonable under the Fourth Amendment when there is probable cause to

believe that a criminal offense has been or is being committed.  Devenpeck v. Alford, 543 U.S.

146, 152 (2004).[3]  Whether probable cause exists depends upon the reasonable conclusion to be

drawn from the facts known to the arresting officer at the time of the arrest.  Id. (citing Maryland

v. Pringle, 540 U.S. 366, 371 (2003)).  The court must look to "the totality of the circumstances

---

[3]Pena cites cases from the Oregon courts but, because he brings a Fourth Amendment
claim, I refer to federal law.

known to the arresting officer, to determine if a prudent person would have concluded there was

a fair probability that the defendant had committed a crime." John v. City of El Monte, 515 F.3d

936, 940 (9th Cir. 2008) (internal brackets omitted). "[T]he collective knowledge of all the

officers involved in the criminal investigation" is relevant. Harper v. City of Los Angeles, 533

F.3d 1010, 1022 (9th Cir. 2008). Additionally, "[p]robable cause is an objective standard and the

officer's subjective intention in exercising his discretion to arrest is immaterial in judging

whether his actions were reasonable for Fourth Amendment purposes." John, 515 F.3d at 940;

Devenpeck, 543 U.S. at 153 (cases make clear that arresting officer's state of mind is irrelevant,

except for the facts that he knows; question is whether circumstances viewed objectively justify

the action). The court makes this determination "based upon the information the officer had at

the time of making the arrest." John, 515 F.3d at 940. Finally, "[w]here the facts or

circumstances surrounding an individual's arrest are disputed, the existence of probable cause is

a question for the jury." Harper, 533 F.3d at 1022.

   The crime for which Pena was arrested was conspiracy to distribute heroin in violation of

ORS 161.450 and ORS 475.850. Accordingly, officers must have had probable cause to believe

Pena had the intent that another person deliver heroin, and that Pena agreed with one or more

persons to deliver heroin. Pena's argument seems to be that officers had no evidence Doe was

something other than a recipient of heroin; under Oregon law, the delivery statute applies only to

the transferor and not to the recipient of contraband. State v. Frederickson, 92 Or. App. 223,

225, 757 P.2d 1366 (1988). As a result, according to Pena, there was no evidence Pena

intentionally engaged in a conspiracy to deliver heroin.

Page 8 - OPINION AND ORDER

Pena also argues probable cause dissipated after a search of his car revealed no evidence of drug activity.  See United States v. Ortiz-Hernandez, 427 F.3d 567, 574 (9th Cir. 2005) ("A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated.").  With respect to the heroin found on the scale, he suggests it could have belonged to Beltran-Carbajal, been planted by the officers, or was transferred from jewelry he and his significant other had weighed with the scale.

Finally, Pena challenges the officers' reliance on the unsubstantiated statements of a confidential informant.  He contends there are no tips from other sources, no deputy saw any drug deals take place, there is no information Doe was reliable, and no confirmation of Doe's call log.

Pena's arguments are not persuasive.  Here, deputies watched an informant purchase heroin from Doe and Doe 2 on three occasions over the course of several months–making them more than recipients of heroin.  The informant told Deputy Jones that the Does' supplier was an Hispanic male.  Deputy Jones and Ferguson followed the Does and, after a short stop at a trailer park, watched Doe and Doe 2 drive to a car dealership on 82nd and meet with an Hispanic male, whom they later learned was Pena.  After undertaking additional surveillance, deputies obtained and effectuated a search warrant on the Does' vehicle, their persons, and their residence.  After giving both of the Does their Miranda rights, Doe told Deputy Jones that his source was "Tony" who worked at a car dealership on 82nd.  He had Tony's phone number in his cell phone and knew his home address.  Doe told Deputy Jones that Tony would give the heroin to him "and that Doe would give Tony the money for the heroin after Doe and Doe 2 had sold the heroin."  Jones

Decl. ¶ 13.  Doe 2 "in a separate interview" confirmed that Tony was their source.  Id.  Deputies

found heroin on Doe's person, and heroin, a scale and packaging material in the Does' residence.

Deputy Jones then watched Doe call "Tony," listening to both sides of the conversation,

while Deputy Zwick watched Pena pick up his phone and talk at the same time.  Deputy Jones

heard Doe tell Tony that he and Doe 2 had been robbed.  Tony asked what happened.  Doe told

Tony that they had been robbed at gunpoint and had lost the money and drugs, and that Doe did

not have the money to pay Tony for the heroin Tony had fronted.  Deputy Jones radioed Deputy

Zwick as soon as the call ended, and Deputy Zwick confirmed he had seen Pena hang up his

phone at the same time.  This interaction confirmed Doe's report that Tony was his supplier.

It is true deputies did not find any heroin in Pena's car, home, or his place of business.

However, under Oregon law, "[t]he crime [of conspiracy] is complete when the conspiratorial

agreement is entered into.  The unlawful agreement and not its accomplishment is the gist or

essence of the crime of conspiracy."  State v. Brewer, 12 Or. App. 105, 108, 504 P.2d 1067

(1973).  Furthermore, "[t]he existence of conspiracy, and its objective, may be proven by

circumstantial evidence."  Id. at 108.  Accordingly, while Pena could not have been arrested for

possession of heroin,  the deputies retained probable cause for a conspiracy to deliver charge

based on information from the informant, Doe, Doe 2, and from the deputies' observations and

surveillance.

In sum, based on "the totality of the circumstances known to the [deputies]," a "prudent

person" would conclude "there was a fair probability that [Pena] had committed a crime."  John,

515 F.3d at 940 (9th Cir. 2008).  Defendants are entitled to summary judgment and Pena's First

Claim for Relief is dismissed with prejudice.  Since I dismiss the claim on its merits, I need not address defendants' qualified immunity argument.

III.     <u>False Arrest</u>

It is Pena's burden to prove by a preponderance of the evidence the first three elements of the false arrest claim.  Those three elements are:  (1) officers confined Pena; (2) officers intended the act that caused the confinement; and (3) Pena was aware of the confinement.  <u>Ross v. City of Eugene</u>, 151 Or. App. 656, 663, 950 P.2d 372 (1997).  There is no dispute on these first three elements.

The burden then shifts to Multnomah County to prove by a preponderance of the evidence that the confinement was lawful.  <u>Id.</u>  Probable cause is a complete defense to a false arrest allegation.  <u>Bacon v. City of Tigard</u>, 81 Or. App. 147, 150, 724 P.2d 885 (1986).

Although Oregon law imposes a subjective requirement–the officer "must hold a belief that the person in question has committed a crime"–Pena has not identified a material issue of fact to undermine Deputy Jones statement that he believed Pena was "involved in the distribution and delivery of heroin."  Jones Decl. ¶ 19; <u>see</u> <u>State v. Kappel</u>, 190 Or. App. 400, 404, 79 P.3d 368 (2003) (criteria for probable cause in Oregon).  The remaining criteria for determining probable cause are the same for state and federal cases and, accordingly, based on my analysis above, the County has demonstrated it had probable cause to arrest Pena.  As a result, the County is entitled to summary judgment on this claim and it is dismissed with prejudice.

IV.     <u>Assault and Battery</u>

Battery is intentional harmful or offensive contact with another.  However, an officer is entitled to use physical force reasonably necessary to make an arrest and "a police officer is

presumed to be acting in good faith in determining the amount of force necessary to make the

arrest." Ballard v. City of Albany, 221 Or. App. 630, 641, 191 P.3d 679 (2008) (citing Rich v.

Cooper, 234 Or. 300, 309, 380 P.2d 613 (1963)).  Since Deputy Jones had probable cause to

arrest Pena, and since Pena testified in his deposition that he had no injuries from the

handcuffing,[4] Pena's battery claim must be dismissed.  See ORS 133.235(4) ("In order to make

an arrest, a peace officer may use physical force as justifiable under ORS 161.235, 161.239, and

161.245."); ORS 161.235 ("[A] peace officer is justified in using physical force upon another

person only when and to the extent that the peace officer reasonably believes it necessary: (1) To

make an arrest . . . unless the peace officer knows that the arrest is unlawful[.]"); Pena Dep.

133:24-134:1; 135:23-136:3 (no injuries from handcuffing).

 Assault is the "intentional attempt to do violence to the person of another, coupled with

present ability to carry the intention into effect." Cook v. Kinzua Pine Mills Co., 207 Or. 34, 48-

49, 293 P.2d 717 (1956).  In his First Amended Complaint, Pena contended the deputies

threatened by words and gestures to do bodily harm to him, referring to the questioning after the

traffic stop and threats of deportation and arrest, but in his briefing he suggests the issue is that

Sergeant Wonacott lifted his pistol slightly (but not out of its holster) while warning Pena not to

do anything stupid.

 Even if Pena could change his theory this far into the case, without an amended complaint

and without identifying this basis for his claim in his tort claims notice, his assault claim fails for

the same reason as his battery claim.  Gigler v. City of Klamath Falls, 21 Or. App. 753, 763, 537

---

[4]Pena's declaration on this point flatly contradicts his deposition testimony; I do not
consider his declaration where he has not provided any explanation for the difference in
testimony.

P.2d 121 (1975) (physical violence to remove plaintiff was not more than necessary, as a result it was justified as a matter of law and could not support claim of assault).  Indeed, Pena testified that one of the deputies said he was "going to take your handcuffs off to show you a level of trust again."  Pena Dep. 191:5-7.  It was only then that Sergeant Wonacott put his hand on his gun and pulled it out of the holster a little bit and said something like "I'm pretty sure you don't want to do anything stupid."  Id. at 191:9-10.  There is no evidence Sergeant Wonacott's action was more than necessary to accomplish the legitimate purpose of fulfilling his duty.

This claim is dismissed with prejudice.

V.    Defamation

Pena alleged in his First Amended Complaint that deputies made statements to his employer, partner and customers that were false and defamatory.  In his briefing, however,  Pena contends that the defamatory statement was made by Deputy Kubic (as translated into Spanish) to Pena's significant other.  Deputy Kubic told Beltran-Carbajal that Pena had been arrested for "making a drug delivery."  Pena's Resp. 12.  Pena insists he was not arrested for making a drug delivery as no drugs were found on him, in his car, or where he worked.  He contends the statement implies he was in possession of illegal drugs.

The elements of defamation are:  (1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting harm.  Nat'l Union Fire Ins. Co. v. Starplex Corp., 220 Or. App. 560, 584, 188 P.3d 332 (2008).  Truth is an absolute defense to a claim of defamation.  Brown v. Gatti, 341 Or. 452, 465, 145 P.3d 130 (2006).

As an initial matter, Pena makes this allegation without requesting permission to amend his complaint.  More importantly, the County's motion for summary judgment must be granted as

the statement made by the deputies was, at its core, truthful–they had arrested Pena for

conspiracy to deliver drugs.  Furthermore, there is no question the deputies made the statement in

the course of their official duties–in explaining their reason for requesting consent to search the

residence–and, as a result, it was privileged.  See Clifford v. City of Clatskanie, 204 Or. App.

566, 580, 131 P.3d 783 (2006) (absolute privilege applies to public officers if the allegedly

defamatory statements were made during the performance of official duties).  Finally, now that

Pena has abandoned his allegations that officers made statements to his employer, customers, and

partner, he has not alleged a resulting harm from any unprivileged defamation.

 This claim must be dismissed with prejudice.

VI. <u>Intentional Infliction of Emotional Distress</u>

 Pena contends Sergeant Wonacott's action of warning him not to be stupid while partially

lifting his gun out of his holster constitutes intentional infliction of emotional distress.  Again,

this allegation does not appear in his First Amended Complaint.  Even if it did, however, I would

dismiss the claim.

 The tort of intentional infliction of emotional distress contains the following elements:

> (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2)
> the defendant's acts were the cause of the plaintiff's severe emotional distress, and
> (3) the defendant's acts constituted an extraordinary transgression of the bounds
> of socially tolerable conduct.

<u>McGanty v. Staudenraus</u>, 321 Or. 532, 543, 901 P.2d 841 (1995).  Whether conduct constitutes

an extraordinary transgression of the bounds of socially tolerable conduct is a question of law.

<u>Harris v. Pameco Corp.</u>, 170 Or. App. 164, 171, 12 P.3d 524 (2000).

Page 14 - OPINION AND ORDER

The conduct alleged by Pena is simply not outrageous conduct.  As the County explains, Sergeant Wonacott had a legitimate safety concern, was permitted to warn a suspect not to be a problem while the suspect was unrestrained, and may do so by referring to a weapon–especially where he never removed his firearm from its holster.  The facts also undermine any characterization of this interaction as outrageous–the two made small talk just after the exchange while Pena smoked a cigarette.

This claim is dismissed with prejudice.

**CONCLUSION**

Defendants' Motion for Summary Judgment [21] is granted.  Pena's First Amended Complaint is dismissed with prejudice.

IT IS SO ORDERED.

DATED this _____29ᵗʰ_____ day of January, 2013.

 /s/ Garr M. King_____
Garr M. King
United States District Judge